694 P.2d 795

The STATE of Arizona, Appellee,

v.

William Henry LACEY, Appellant.

No. 2 CA–CR 2957.

Court of Appeals of Arizona,
Division 2.

July 5, 1984.

Review Denied Jan. 22, 1985.

Robert K. Corbin, Atty. Gen. by Bruce M. Ferg, Asst. Atty. Gen., Tucson, for appellee.

Bob Barber, Jr., Tucson, for appellant.

## OPINION

BIRDSALL, Chief Judge.

This is a narcotics case wherein the appellant was found guilty of (1) conspiracy to commit a class 2 felony, unlawful possession of cocaine for sale with a value over $250, (2) unlawful possession of cocaine for sale with a value over $250 and (3) unlawful transportation and importation of cocaine over $250 in value. He had no previous record, and his defense was entrapment.

The record showed that on the morning of January 23, 1982, officers received information through an informant, Kenneth Alvey, that the appellant and Robert Lewis Shockey had gone to Florida to obtain a large quantity of cocaine. They were advised that appellant would fly back from Florida and would be staying at the Ghost Ranch Lodge in Tucson, while Shockey would drive the cocaine back from Florida to Tucson and would meet appellant either on January 23 or 24, 1982.

Officers then went to the Ghost Ranch Lodge and learned that appellant was staying in room number 2. They were advised by a clerk that appellant had received a telephone message from a subject by the name of Bob. The clerk subsequently gave the telephone number and room number to officers, who later ascertained that the telephone number belonged to the Plaza International Hotel. Officers then ascertained that Robert Shockey had checked into the Plaza that afternoon.

Subsequently, appellant was observed arriving at the Plaza International Hotel and going up to the sixth floor carrying a green shoulder bag which appeared to be empty.

Approximately forty minutes later, he was observed exiting room 630, and at this time the shoulder bag appeared to have something in it. At this time appellant was placed under arrest and the bag was searched and found to contain approximately one kilogram of cocaine.

The officers then went up to room 630, knocked on the door and identified themselves. Agent Anderson observed Shockey throw an object out the window of the room. The object was subsequently retrieved by Anderson, and was found to be a brown zippered case containing what was later determined to be cocaine.

A telephonic search warrant was then obtained to search the person of appellant, room 2 of the Ghost Ranch Lodge, and a 1979 Chevrolet pickup which appellant had been seen driving. In the transcript of that telephone conversation, Judge West made a specific finding of good cause for a nighttime search.

Pursuant to the search of room 2 of the Ghost Ranch Lodge, various items were seized including an address book which contained Shockey's name and telephone number. Appellant testified that he had never previously been involved in drug dealing and that it was only after constant urging and pressure applied by Alvey that he reluctantly became involved. He indicated that the January 1982 transaction was arranged by Alvey, and it was agreed that Alvey would not only fly the cocaine back from Florida, but would also arrange for its subsequent sale. Appellant claimed that although he knew Shockey briefly from the past, it was not until Alvey backed out of flying the cocaine back to Arizona that he enlisted the help of Shockey.

On cross-examination the prosecutor asked appellant if he had called Mr. Shockey before going to Miami. The appellant replied that he did not believe he had, as he had no reason to contact Shockey. The prosecutor then used long distance toll records from the Ghost Ranch Lodge and appellant's telephone book, which was seized pursuant to the search warrant, to

establish that in fact three telephone calls had been made to Mr. Shockey's telephone number.

As a result of the entrapment defense, a substantial portion of the State's case dealt with prior drug dealings of the appellant. This was shown through the witness Alvey, and through testimony from three witnesses regarding a transaction which occurred on May 12, 1980, involving another individual by the name of Lance Estes.

Alvey testified to three drug transactions, the first occurring in October 1981 and the final transaction being the instant offense in January 1982. In each of these transactions, Alvey acted as middleman between appellant and the suppliers of cocaine and received a total sum of $6,000 from appellant, which he kept. Alvey also testified concerning other alleged prior drug transactions with appellant, including the purchase by appellant of 950 pounds of marijuana from Alvey and an attempted marijuana run which did not materialize. In addition, Alvey testified to alleged conversations between himself and appellant wherein the latter told him about a sale of cocaine to an individual named Mark Burton.

During direct examination of Alvey, the following question was asked by the prosecutor:

As an undercover agent working for the police, can you describe the effect of your becoming identified to the members of the criminal elements?

Over objection by defense counsel the witness answered:

Depending on the group and how many cases you've your life is usually not worth two cents.

Defense counsel asked that the answer be stricken, and the court then instructed the jury to disregard the answer. Mr. Alvey was accompanied to the courtroom to testify by two plainclothes police officers acting as bodyguards. The court denied a defense request that they be excluded from the courtroom.

Two police officers and Lance Estes testified concerning the arrest of Estes on May 12, 1980 in Miami. Officer Robert McGavock of the Dade County Police Department testified that he observed Estes driving a vehicle up to the Miami International Airport, and then observed an individual identified to him as James Henry Randolph exiting the vehicle. The witness identified appellant as the person he knew as Randolph. Subsequent actions by the two individuals made the officers suspicious and they approached Mr. Estes. After a brief conversation they searched his luggage and found approximately two pounds of cocaine. Appellant gave his permission to look in his luggage. This search disclosed a valuable microscope and a boil point thermometer. The officer testified that this type of thermometer is used in conjunction with a microscope to test the quality of cocaine. Appellant was not arrested at that time. Officer William Glenn then testified to facts which occurred subsequently on May 12, 1980, when appellant was arrested at the Dallas airport. The officer testified that his department had received a call from the Dade County Police Department indicating that an arrest had been made of a subject in Florida who had been in possession of one kilogram of cocaine. It was further indicated that "... they believed that a subject who was affiliated with him would be arriving on the Braniff flight in the Dallas-Fort Worth Airport."

Before meeting the flight, officers received a call from the airlines indicating that the crew had become alarmed because an individual had changed clothes several times, was extremely nervous and had gone to the restroom of the plane and discarded several credit cards and broken a quantity of glass vials.

The Dallas officers suspected that the individual whom the Florida authorities had inquired about was the same individual whom airline officials had advised Dallas authorities about. The officers met the plane and the stewardess pointed out the appellant as the individual who had acted suspiciously on the plane. He was placed under arrest at that time but was not

charged with any offense and was subsequently released.

The stewardess provided officers with the torn up credit cards which contained the name William Henry Lacey. Appellant denied knowledge of the credit cards and continued to identify himself as Randolph. A plastic insert for the insertion of pictures, credit cards, etc. was found in appellant's luggage. The imprint of the name William Henry Lacey was visible on the insert; when confronted with this, he admitted his true name.

Lance Estes testified that he met the appellant in Florida in May 1980, having previously agreed with him to purchase a kilo of cocaine, each party to have supplied one-half of the money for its purchase. Prior to his court testimony, Estes had been arrested and the State filed a petition to require bond of a witness, attaching thereto police reports demonstrating why it was believed that Estes' testimony was believed to be material. It was established through cross-examination of Estes that a $10,000 bond had been requested by the State, and that: following some negotiation between Estes' lawyer and the prosecutor, a $500 bond was agreed upon to assure his testimony. However, the witness Estes denied knowing that the prosecutor wanted to talk to him about the appellant. He did, however, concede that his attorney had seen the petition to require bond and that he was immunized from any prosecution by federal authorities in relation to the offense for which he had testified.

The appellant moved that the State's petition to require bond of a witness, filed August 31, 1982, and the subsequent minute entry be admitted into evidence. The court denied that motion.

In this appeal the appellant contends the trial court erred in:

1) Permitting the informant to testify about what might happen to an informant and in permitting the two bodyguards in the courtroom.

2) Refusing admission of the petition to require bond of Estes and the minute entry.

3) Denying his motion to suppress the nighttime search of his motel room.

4) Allowing Alvey to testify to alleged statements made by the appellant regarding prior narcotics activities.

5) Permitting the evidence of the Dallas arrest, and

6) Denying his motion for directed verdict based on the entrapment defense.

We affirm. We will discuss the issues in the order presented.

### The Informant

■ The informant's testimony that an informant's life is usually not worth two cents was stricken and the jury admonished not to consider it. Assuming *arguendo* that this ruling was correct, we believe that prompt action by the trial court was sufficient to overcome any prejudicial error. *See State v. Clow*, 130 Ariz. 125, 634 P.2d 576 (1981). The testimony did not directly involve the appellant. In fact, the witness testified he was not afraid of the appellant. We also give the jurors credit for realizing that an informant might be in danger of retaliation without any such evidence. The single comment was quite harmless.

■ As for the guards, the trial court stated for the record that they were not in uniform and "did not even look like cops". The court permitted them to remain in the courtroom for security reasons, and this was sufficient. *See State v. Greenawalt*, 128 Ariz. 150, 624 P.2d 828 (1981) and *State v. Watson*, 114 Ariz. 1, 559 P.2d 121 (1976), cert. denied 430 U.S. 986, 97 S.Ct. 1687, 52 L.Ed.2d 382 (1977). Further, no prejudice was shown. *Cf. State v. Galioto*, 126 Ariz. 188, 613 P.2d 852 (App.1980).

### Estes Bond Documents

■ The state moved to require the witness Estes to post an appearance bond. The written motion filed in the Pima County Superior Court asked that the bond be set at $10,000, but this was reduced to $500. Estes testified to the original amount requested and the reduction. He denied that he knew the state wanted to

talk with him about the appellant, a fact contained in the petition to require bond. The trial court refused the admission of the petition and the subsequent minute entry requiring the $500 bond.

We fail to see the relevance of these documents. They would not show that Estes knew this matter involved appellant. The facts of the original $10,000 request and the reduction were shown through the testimony of Estes. The best evidence rule, an argument presented by the appellant, is inapplicable. There is no issue requiring proof of the contents of the petition.

The appellant's contention that the documents went to the credibility of the witness is not convincing. Assuming *arguendo* that the documents were admissible for this reason, the credibility of Estes was otherwise impugned by showing prior convictions, lying to authorities and a promise of federal immunity. We find no error, much less reversible error.

### The Nighttime Search

██ The search warrant issued telephonically provided that the search could be conducted in the nighttime. The magistrate found good cause for a nighttime search. The warrant was authorized at 1:30 a.m., shortly after the appellant and Shockey had been arrested at the Plaza International Hotel. The affidavit which was read to the magistrate detailed the cocaine operation and the events which culminated in the arrests. No specific facts were related to the good cause showing from which the magistrate could exercise discretion and authorize the nighttime search. A.R.S. § 13–3917 provides:

Upon a showing of good cause therefor, the magistrate may, in his discretion insert a direction in the warrant that it may be served at any time of the day or night. In the absence of such a direction, the warrant may be served only in the daytime. For the purposes of this section night is defined as the period from ten p.m. to six-thirty a.m.

The affidavit clearly established that this was a large-scale operation involving the importation of a multi-pound quantity of cocaine from Florida. One of the conspirators had already attempted to dispose of some of the narcotic. There was probable cause to believe paraphernalia for use in preparing the cocaine for sale, as well as records, if not other narcotics, would be found on the appellant's person, in his car or in his motel room. These were the locations to be searched pursuant to the warrant. It was imperative that the search, at least of the motel room, be conducted immediately so that evidence would not be lost or destroyed.

Further, we believe that, if there was technical error in directing the nighttime search, both the magistrate and the superior court judge who denied the motion to suppress could properly have considered the fact that no one would be disturbed by the searches. The antipathy to night searches stems from the greater intrusiveness involved in rousing people out of their sleep and suddenly confronting them with the police, a situation particularly fraught with the potential for conflict and even violence. Where, however, there is no citizen to confront, these problems disappear. Accordingly, it has repeatedly been held that defects in the authorization of a night search are of no moment when the place searched was not occupied. *See, e.g., United States v. Ravich,* 421 F.2d 1196, (2d Cir.1970), cert. denied, 400 U.S. 834, 91 S.Ct. 69, 27 L.Ed.2d 66; *Tidwell v. Superior Court,* 17 Cal.App.3d 780, 95 Cal.Rptr. 213 (1971); *State v. Chandler,* 267 S.C. 138, 226 S.E.2d 553 (1976). We find that the motion to suppress was properly denied.

### Appellant's Statements to Informant

██ The informant testified that on several occasions the appellant told him he had sold cocaine to one Mark Burton. The appellant contends that this testimony should not have been admitted since there was no other proof of this prior bad act. In other words, the appellant's admissions are the only proof. The appellant contends that the well-established requirement that evidence sufficient to take the act to a jury must be shown before a prior act may be

admitted must be satisfied. We disagree. The defense of entrapment puts predisposition and criminal intent in issue. *State v. Korte*, 115 Ariz. 517, 566 P.2d 318 (App. 1977). We believe this renders testimony concerning admissions of prior narcotics transactions by the appellant admissible. Compare *State v. Johnson*, 121 Ariz. 545, 592 P.2d 379 (App.1979) and *State v. Sanchez*, 130 Ariz. 295, 635 P.2d 1217 (App. 1981).

### The Dallas Arrest

■ The appellant's contention that evidence of his arrest in Dallas should not have been admitted because there was no probable cause for the arrest misses the point. The arrest in Dallas was the result of activities in Florida before the appellant boarded the plane for Dallas. Even assuming there was no probable cause for his arrest, the witness Estes testified that he and the appellant were together in the cocaine transaction involving the two pounds of cocaine found in Estes' luggage at the Miami airport. The Dallas arrest merely completes the story of that prior narcotics activity.

### Denial of Directed Verdict

■ The appellant attempts to bring this case within the "entrapment as a matter of law" doctrine set forth in *State v. Boccelli*, 105 Ariz. 495, 467 P.2d 740 (1970) and *State v. McKinney*, 108 Ariz. 436, 501 P.2d 378 (1972). In each of those cases the government actually supplied the narcotics. That fact is not present in the instant case. The informant, Alvey, was "working off" an Arizona sentence. He had known the appellant since 1976. He had sold the appellant 950 pounds of marijuana six months after they first met. They had seen each other several times after that and had been involved together in another aborted transaction. What the informer did in the instant case is bring the appellant and the supplier together. He served as a middle man for which the appellant paid him $2,000. The transaction itself was for $110,000. These facts bring this entrapment defense within the reasoning of *State v. Cox*, 110 Ariz. 603, 522 P.2d 29 (1974),

which distinguishes *Boccelli* and *McKinney*. See also *State v. Million*, 120 Ariz. 10, 583 P.2d 897 (1978). The trial court was eminently correct when it denied the directed verdict.

Affirmed.

HATHAWAY and HOWARD, JJ., concur.